O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-6449 ODW (JCx) | Date | November 6, 2009 |
|---|---|---|---|
| Title | *Laurence Paskowitz v. Pacific Capital Bancorp, et al.* | | |

| Present: | The Honorable Otis D. Wright II, United States District Judge | | |
|---|---|---|---|
| Raymond Neal | | Not Present | n/a |
| Deputy Clerk | | Court Reporter | Tape No. |

Attorneys Present for Plaintiff(s):           Attorneys Present for Defendant(s):

Not Present                                              Not Present

**Proceedings (IN CHAMBERS):**     Defendants' Motion to Dismiss [19]

Plaintiff Laurence Paskowitz ("Plaintiff") brings this shareholder action against Defendant Pacific Capital Bancorp Company ("Pacific") and the members of its Board of Directors (collectively, "Defendants") asserting proxy violations under Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9. Also alleged is a claim for breach of fiduciary duty by Pacific's board of directors.

On September 9, 2009, Plaintiff filed an ex parte application for a temporary restraining order seeking to enjoin the September 29, 2009 shareholder vote on a proposal contained in Pacific's August 31, 2009 proxy statement. The Court denied Plaintiff's application on September 14, 2009. The matter is now before the Court on Defendants' Motion to Dismiss Plaintiff's complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). Having considered the arguments raised in support of and in opposition to the instant Motion, the Court deems this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; Local Rule 7-15. For the following reasons, Defendants' Motion is **GRANTED**.

**I.     FACTUAL BACKGROUND**

Plaintiff's alleged facts can be briefly summarized as follows.

On August 31, 2009, Defendants distributed a proxy statement seeking shareholder approval of an amendment to Pacific's articles of incorporation in order to effectuate, among other things, a "reverse stock-split" of Pacific's outstanding common stock. (Compl. ¶ 8.) The relevant portion of this proxy statement is identified as "Proposal 2." It reads as follows:

**Background and Reasons for the Reverse Stock Split**

The Board of Directors is submitting the Reverse Stock Split to our shareholders for approval with the primary intent of increasing the market price of our common stock to make our common stock more attractive to a broader range of institutional and other investors. In addition to increasing the market price of our common stock, the Reverse Stock Split would also reduce certain of our costs, as discussed below. Accordingly, for these and other reasons discussed below, we believe that effecting the Reverse Stock Split is in the Company's and our shareholders' best interests.

We believe that the Reverse Stock Split will make our common stock more attractive to a broader range of institutional and other investors, as we have been advised that the current market price of our common stock may affect its acceptability to certain institutional investors, professional investors and other members of the investing public. Many brokerage houses and institutional investors have internal policies and practices that either prohibit them from investing in low-priced stocks to their customers. In addition, some of those policies and practices may function to make the processing of trades in low-priced stocks economically unattractive to brokers. Moreover, because brokers' commissions on low-priced stocks generally represent a higher percentage of the stock price than commissions on higher-priced stocks, the current average price per share of common stock can result in individual shareholders paying transaction costs representing a higher percentage of their total share value than would be the case if the share price were substantially higher. We believe that the Reverse Stock Split will make our common stock a more attractive and cost effective investment for many investors, which will enhance the liquidity of the holders of our common stock.

Reducing the number of outstanding shares of our common stock through the Reverse Stock Split is intended, absent other factors, to increase the per share market price of our common stock. However, other factors, such as our financial results, market conditions and the market perception of our business may adversely affect the market price of our common stock. As a result, there can be no assurance that the Reverse Stock Split, if completed, will result in the intended benefits described above, that the market price of our common stock will increase following the Reverse Stock Split or that the market price of our common stock will not decrease in the future. Additionally, we cannot assure you that the market price per share of our common stock after a Reverse Stock Split will increase in proportion to the reduction in the number of shares of our common stock outstanding before the Reverse Stock Split. Accordingly, the total market capitalization of our common stock after the Reverse Stock Split may be lower than the total market capitalization before the Reverse Stock Split.

In addition to increasing the price of our common stock, we believe that a Reverse Stock Split will provide us and our shareholders with other benefits. Currently, the fees that we pay to list our shares on the NASDAQ Global Select Market are based on the number of shares we have outstanding. Also, the fees that we pay for custody and clearing services, the fees that we pay to the SEC to register securities for issuance and the costs of our proxy solicitations are all based on or related to the number of shares being held, cleared or registered as applicable. Reducing the number of shares that are outstanding and that will be issued in the future may reduce the amount of fees and tax that we pay to these organizations and agencies, as well as other organizations and agencies that levy charges based on the number of shares rather than the value of the shares.

(Compl. Exh. A at 10-11.)

According to Plaintiff, "the Proxy Statement at issue here never discloses the typical scenario that unfolds subsequent to a reverse split.  Instead, it heavily emphasizes possible advantages, and gives short shrift to risks." (Compl. ¶ 15.)  The "typical scenario," as alleged by Plaintiff, is that such reverse-split transactions "ordinarily cause" a decline in value of a company's stock. (Compl. ¶ 8.)  Plaintiff alleges Defendants did not adequately inform its shareholders of this potential risk, causing them to believe instead that approving the split will "likely immediately help them financially." (Compl. ¶ 8.)  Because Defendants negligently omitted the "known" risks of a reverse stock-split, Plaintiff alleges he, and others similarly situated, were materially misled.

Plaintiff also alleges that the Board of Directors' stated belief that a reverse split "will enhance the liquidity of the holders of our common stock" is potentially misleading. (Compl. ¶ 21.)

## II.  LEGAL STANDARD

### A.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a party's motion to dismiss when the complaint fails "to state a claim upon which relief can be granted."  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To sufficiently state a claim for relief and survive a 12(b)(6) motion, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id*. Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal citation and quotation marks omitted).

In deciding whether to grant a motion to dismiss, the court must accept as true all "well-pleaded factual allegations." *Iqbal*, 129 S. Ct at 1950. A court is not, however, "required to accept as true allegations that are merely conclusory unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see, e.g.*, *Doe I v. Wal-Mart Stores, Inc.*, __ F.3d __, 2009 WL 1978730, at *3 (9th Cir. July 10, 2009) ("Plaintiff's general statement that Wal-Mart exercised control over their day-to-day employment is a conclusion, not a factual allegation stated with any specificity. We need not accept Plaintiff's unwarranted conclusion in reviewing a motion to dismiss.").

Thus, the Ninth Circuit has summarized the governing standard, in light of *Twombly* and *Iqbal*, as follows: "In sum, for a complaint to survive a motion to dismiss, the non-conclusory

factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff brings three causes of action. The first is against all Defendants "For a Permanent Injunction against Violations of Section 14(a) of the Exchange Act, Rule 14a-9 and California Law;" the second is against all Defendants for a "Declaratory Judgment that the Vote Pursuant to the Proxy Statement is Void Pursuant to Section 14(a) of the Exchange Act . . .;" and the third is a purported class claim against the individual Director Defendants for breach of fiduciary duty. In light of the Court's denial of Plaintiff's ex parte application for a temporary restraining order, the shareholder vote took place as scheduled. Plaintiff's first cause of action, which seeks to permanently enjoin the contested proxy statement from being voted upon, is therefore MOOT. The Court now turns to Plaintiff's second cause of action.

### A. Section 14(a) Claim

Plaintiff's second cause of action is against all Defendants and requests a declaratory judgment that the shareholder vote that took place on September 29, 2009 is void because the proxy statement submitted for shareholder approval contained materially false and misleading information and/or omissions in violation of § 14(a) of the Securities Exchange Act, and Rule 14a-9. For the following reasons, the Court finds that Plaintiff's Complaint fails to state a § 14(a) claim and therefore DISMISSES this cause of action.

Section 14(a) makes it unlawful for any person to solicit, in violation of regulations promulgated by the SEC, "any proxy or consent or authorization in respect of any security . . . registered pursuant to section 78l." *See* 15 U.S.C. § 78n(a). SEC Rule 14a-9 provides: "No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." *See* 17 C.F.R. § 240.14a-9(a). The United States Supreme Court has held that § 14(a) "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976) (internal quotations and citations omitted). Thus, § 14(a) acts to "ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *See id.* at 448.

To state a claim under Section 14(a), a plaintiff must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation, [rather than the particular defect in the solicitation materials], was an 'essential link in the accomplishment of the transaction.'" *Atlantic Coast Airlines Holdings v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 81-82 (D.D.C. 2003) (quoting *General Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970)).

Moreover, the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading requirements apply to claims brought under Section 14(a) and Rule 14a-9. *See In re McKesson*

*HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal.2000).  However, unlike Section 10(b), Section 14(a) "lacks any reference to a 'manipulative device or contrivance . . . to indicate a requirement of scienter." *Id.* at 1263.  Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a) for both forward looking and non-forward looking statements.  *Id.* at 1267 ("a Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence").

### 1. Failure to Disclose Risks of a Reverse Stock Split

As recounted earlier, Plaintiff's main allegation is that the proxy statement omits any reference to potential, "known" risks of a reverse stock split.  For example, chief among Plaintiff's allegations is that Defendants failed to disclose what, in his view, "typically" occurs after a reverse split: price decline and loss in stock value.  (Compl. ¶¶ 8, 13-14, 16.)  However, many, if not all, of the alleged risks inherent in a reverse stock split that Plaintiff contends were negligently omitted are actually disclosed.  In these instances there can be no § 14(a) violation.  The Court notes the following four disclosures:

> (1) "there can be no assurances that the Reverse Stock Split, if completed, will result in the intended benefits . . . , that the market price of our common stock will increase following the [split] or that the market price of our common stock will not decrease in the future;" (2) "we cannot assure you that the market price per share of our common stock after a Reverse Stock Split will increase in proportion to the reduction in the number of shares of our common stock outstanding before the Reverse Stock Split;" (3) "the total market capitalization of our common stock after the Reverse Stock Split may be lower than the total market capitalization before the Reverse Stock Split;" and (4) "[h]owever, other factors, such as our financial results, market conditions and the market perception of our business may adversely affect the market price of our common stock."

(Compl., Exh. A at 10.)

These disclosures are clear, adequate and supported by other district courts that have encountered similar statements.  As to disclosures (1) and (2), contrary to Plaintiff's position, language such as "there can be no assurance" or "we cannot assure" are not grounds for finding the statement impermissibly misleading.  These statements, prefaced by such assurances (or lack thereof), provide sufficient information to the shareholders so as to enable them to draw their own conclusions as to the risks of a potential reverse stock split.  *See, e.g. Washtenaw County Employees' Retirement Sys. v. Wells Real Estate Inv. Trust, Inc.*, 2008 WL 2302679, at *5 (N.D. Ga. 2008) (finding "[t]here can be no assurance that we will determine to list" as an adequate disclosure of the fact that a listing may or may not occur); *Tracinda v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 413-14 (D.Del. 2005) ("There can be no assurance . . . .").

Similarly, the proxy statement discloses how the company's stock in its pre-split state is perceived by investors and brokerage firms (fourth disclosure), and how this may reflect on the ultimate value of the outstanding stock post-split.  Finally, even if, as Plaintiff argues, the third disclosure noted above (market capitalization) is construed as technical, financial jargon, incomprehensible by the average investor, the preceding three, unequivocal disclosures diminish any possibility that a reasonable shareholder will be mislead into thinking that a post-split decline

will *not* occur.

Plaintiff has simply not identified, with the particularity required by the PSLRA, why, in light of the disclosures noted above, anything further is required. To be sure, Plaintiff does allege that the "typical" risks of a reverse split were "known" because two financial journals have reported on the detrimental effects of reverse stock splits, and proxy statements by other companies recommending a reverse stock split have been, in Plaintiff's opinion, more "candid" with respect to the potential consequences of a reverse split. (Compl. ¶¶ 17-19.)

Even still, these allegations are insufficient. Putting aside for the time being the Court's findings above that all allegedly omitted risks were, in fact, adequately disclosed, Plaintiff makes no allegation that these financial journals' studies were not readily publicly available; i.e. that they were material *facts*. An omitted fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information made available." *See TSC Indus.*, 426 U.S. at 400. "The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) (citation omitted). Securities laws do not require disclosure of information that is readily available in the public domain. *See, e.g., Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995) (noting "securities laws require the disclosure of information that is not otherwise in the public domain").

Moreover, even if Plaintiff could make such allegations (i.e., that these allegedly omitted risks were not readily and publicly known)–which, in drawing a favorable inference, appears to be the case–Plaintiff still fails to allege that these studies were commonly known by *Defendants* and negligently omitted at the time the proxy statement was distributed. Given the relative obscurity of these studies–indeed, even Plaintiff alleges one of the journals noted the underlying study "in passing"–it would be difficult to conceive of any non-conclusory set of facts capable of plausibly suggesting that Pacific negligently failed to uncover and report these journals' findings. Further, other than the mere fact that these studies refer to reverse stock splits, Plaintiff fails to allege, other than by way of his own conclusory opinion, how or why Defendants' reverse split proposal would yield similar results. The Court cannot simply *presume* as much. Accordingly, Plaintiff's bare allegations that two journals assessed the very real risks of reverse stock splits are insufficient to state a § 14(a) claim.

As to Plaintiff's allegations relating to proxy statements by other companies, these also fail to state a § 14(a) claim. Plaintiff's complaint provides proxy disclosures of three different companies that Plaintiff alleges contain a more "candid" explanation of potential reverse split risks. (Compl. ¶¶ 18-19.) Noting these other companies' disclosures, Plaintiff alleges that while Pacific need not provide an "overload of information," it "(as other companies have done before it) . . . need only provide the voters with a few more explanatory lines and disclosures, so as to balance the presentation." (Compl. ¶ 20.) Essentially, Plaintiff is alleging that Defendants' proxy statements are incomplete when compared to other companies' disclosures.

Two problems arise with respect to these allegations. First, Plaintiff fails to allege any *facts* whatsoever that would make these other proxy statements relevant. Every company is different; each have unique qualities that may influence stock value, whether pre-split or post-split. Here, the Complaint is bereft of any allegation as to the nature of these companies' business, the way in which

their stock may have been perceived prior to their respective reverse splits, or any other information that would necessitate disclosing, in more or less detail, risks inherent in a reverse split transaction. Plaintiff cites to no authority for the proposition that Defendants ought to include disclosures similar to those of other companies regardless of any economic similarities between the two.

Second, "[s]ection 14(a) and Rule 14a-9 do not obligate corporate officials to present, no matter how unlikely, every conceivable argument against their own recommendations," as long as they "disclose all known material facts so that shareholders can make informed choices." *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1024 (9th Cir. 2000). Indeed, "federal law is satisfied as long as the proxy materials fully and fairly set forth the relevant and material facts from which a reasonable shareholder may draw his own conclusions as to how to vote." *See New England Anti-Vivisection Society, Inc. v. U.S. Surgical Corp., Inc.*, 889 F.2d 1198, 1202 (1st Cir. 1989). As the Court has already noted, all Defendants are required to do, which they have, is to present potential, known risks in a manner that a reasonable investor can understand and be expected to consider before voting. Nothing more is required, no matter how "incomplete" Plaintiff alleges the operative disclosures to be.

      2. Liquidity

Apart from Plaintiff's allegations regarding omitted risks of a reverse stock split, Plaintiff alleges that the following proxy statement could be misleading if not "corrected, modified, or better explained. . .": "[w]e believe the Reverse Stock Split will make our common stock a more attractive and cost effective investment for many investors, which will enhance the liquidity of the holders of our common stock." (Compl., Exh. A at 10.) Plaintiff offers the following allegations as to why he believes this to be the case:

> "It is well-known in the world of finance that the fewer the shares outstanding, the less the liquidity. Indeed, 'liquidity' refers to the market's ability to handle a large volume of trading without significant price swings. Presently, [Pacific] shares are highly liquid, often trading over one million shares per day. If a 1 for 10 reverse split were ordered by the Board (or even a split at a somewhat lower ratio), liquidity would be adversely affected in the sense that institutions would find it quite difficult to purchase or sell a large volume of shares. In proxy statements issued by companies contemplating similar reverse stock splits, voting shareholders are often warned that the reverse split will hurt liquidity, not help it. The [ ] Board may have meant to convey that [Pacific]'s liquidity could be enhanced in the sense that a new investor or an existing institutional investor might be more interested in buying a large block of newly-issued shares post-split. If so, they did not express this clearly, and further explanation is required. Without such new investment it is difficult to understand how a very small share float could be more liquid than a much larger float.

(Compl. ¶ 21.)

To the extent Plaintiff's allegations are drawing upon what Defendants ought to have done in light of statements made by other companies, the Court's discussion above governs. As to the remainder of Plaintiff's "liquidity" allegations, they fail to state a § 14(a) claim.

To begin, the proxy's statement that "[w]e believe the Reverse Stock Split will make our

common stock a more attractive and cost effective investment for many investors, which will enhance the liquidity of the holders of our common stock," (Compl., Exh. A at 10), is more appropriately construed as a statement of belief, or opinion of the Board of Directors. As the Supreme Court has noted, a statement of belief by corporate directors may be material, and thus, actionable under § 14(a). *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991). However, such liability cannot be based merely on Defendants' subjective belief of the stated opinion, without "objective evidence . . . that the statement also expressly or impliedly asserted something false or misleading about its subject matter." *See id.* All courts to have addressed this issue since *Virginia Bankshares* have concluded that a defendant's stated opinion or belief is not actionable under § 14(a) unless " (1) the speaker did not actually hold the opinion, and (2) the opinion was objectively false or misleading." *See In re Textainer P'ship Sec. Litig.*, 2005 WL 3801596, at *9 (N.D. Cal. 2005) (citations omitted).

As Defendants correctly note, the proxy statement highlights, for various, adequately researched and disclosed reasons, that a reverse stock split is likely to increase the interest and willingness of a buyer to purchase higher-priced Pacific stock. Specifically, the proxy statement discloses the Board's opinion that because brokers' commissions on low-priced stocks generally represent a higher percentage of the stock price than commissions on higher-priced stocks, the current average price per share of common stock can result in individual shareholders paying transaction costs representing a higher percentage of their total share value than would be the case if the share price were substantially higher. Plaintiff challenges this *belief* in much the same way he does with other proxy statements–by *disagreeing* with the proxy's disclosures. Plaintiff simply alleges that Defendants' belief that a reverse stock split will enhance the liquidity of their shareholders is, in *his view*, potentially misleading. The failure to allege any *facts*, let alone provable, particularized facts as required by § 14(a), that Defendants did not believe its stated opinion, or that it was otherwise objectively false (*see* Section III.A.1), is fatal to Plaintiff's ability to state a plausible claim.

B.      Breach of Fiduciary Duty

Plaintiff's third cause of action is against the Director Defendants for breach of fiduciary duty. The theory of breach is that the Director Defendants did not fully, completely and accurately disclose to their shareholders the potential, "known" risks of a reverse stock split, as alleged by Plaintiff's second cause of action. Because the Court is already of the opinion that Plaintiff's second cause of action fails to state a claim upon which relief can be granted, Plaintiff's third cause of action is dismissed with leave to amend for the same reasons.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiff has failed to plead any specific set of non-conclusory facts that Defendants knew of the risks alleged and negligently omitted them from the proxy statement. Plaintiff's first cause of action is MOOT, and his second and third causes of action are DISMISSED with twenty (20) days leave to amend. Should Plaintiff choose to amend, he must do so in good faith, and Plaintiff's counsel is reminded of his Fed. R. Civ. P. 11 obligations.

**IT IS SO ORDERED.**

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-6449 ODW (JCx) | Date | November 6, 2009 |
|---|---|---|---|
| Title | *Laurence Paskowitz v. Pacific Capital Bancorp, et al.* | | |

                                                                -- : 00
                                          Initials of Preparer    RGN